**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

FREDERICK SMITH and TAHMEL GORDON,

                             Plaintiffs,               1:17-cv-00077 (BKS/CFH)

v.

POLICE OFFICER STEPHEN SAWYER, POLICE
OFFICER KYLE ESPOSITO, DEPUTY JAMES RILEY,
INVESTIGATOR TIMOTHY JORDAN, and TROOPER
BRENDAN FILLI,

                             Defendants.

**Appearances:**

*For Plaintiffs:*
David A. Zelman
The Law Office of David Zelman
709 Eastern Parkway
Brooklyn, New York 11213

Roberta D. Asher
Asher & Associates, P.C.
111 John Street, 14th Floor
New York, New York 10038

*For Defendants Stephen Sawyer and Kyle Esposito:*
Michael T. Cook
Cook, Netter, Cloonan, Kurtz & Murphy, P.C.
85 Main Street
Kingston, New York 12402

*For Defendants Timothy Jordan and Brendan Filli:*
Letitia James
Attorney General for the State of New York
Christopher J. Hummel
The Capitol
Albany, New York 12224

*For Defendant James Riley:*
David L. Posner
McCabe & Mack LLP
63 Washington Street
Post Office Box 509
Poughkeepsie, New York 12602

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

Plaintiffs Frederick Smith and Tahmel Gordon bring this action under 42 U.S.C. § 1983 alleging that their Fourth Amendment rights were violated during a January 25, 2014 traffic stop. Specifically, Plaintiffs allege that Defendants, Town of Lloyd Police Department Officers Stephen Sawyer and Kyle Esposito ("Town Defendants"); New York State Police Troopers Timothy Jordan[1] and Brendan Filli ("State Defendants"); and Ulster County Sheriff's Deputy James Riley, violated their Fourth Amendment rights by subjecting Plaintiffs to excessive force (Claims 1 and 2) and failing to intervene (Claim 3). (Dkt. No. 81).[2]

Presently before the Court are Defendants' motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. Nos. 99, 100, 101). Plaintiffs oppose the motions. (Dkt. Nos. 105). The Court heard oral argument on January 7, 2020. For the reasons that follow, Defendant Riley's motion is granted; the State Defendants' motion is denied; and the Town Defendants' motion is granted in part and denied in part.

---

[1] Plaintiffs misspelled Jordan's name as "Jordon" in the Amended Complaint. (*See* Dkt. No. 81; Dkt. No. 99-1, at 345). The Court refers to him as Jordan.

[2] At Smith's March 18, 2019, deposition, Plaintiffs agreed to discontinue all claims by Smith against Riley. (Dkt. No. 100-11, at 9; Dkt. No. 100-1, ¶ 116; Dkt. No. 198, ¶ 116). In their memorandum of law opposing summary judgment, Plaintiffs agree to discontinue all claims against Town of Lloyd Police Department Officers John Zani and Anthony Kalimeras, and New York State Trooper Farhan Khan. (Dkt. No. 105, at 8). At oral argument on the motions, the parties stipulated to dismissal of these claims and parties.

## II.    FACTS[3]

### A.    Defendants Respond to Gunshots Fired at the Home Club[4]

At approximately 4 a.m. on January 25, 2014, Defendants were advised that a shooting had occurred at the Home Club in Highland, New York. (Dkt. No. 99-1, at 14; 99-5, ¶ 1; Dkt. No. 106, ¶ 1; Dkt. No. 100-10, at 2; Dkt. No. 101-10, ¶ 7; Dkt. No. 107, ¶ 7). Defendants learned that the suspects fled the shooting. (Dkt. No. 99-1, at 486; 99-5, ¶ 2; Dkt. No. 106, ¶ 2; 101-10, ¶ 7; Dkt. No. 107, ¶ 7).

Town of Lloyd Police Officer Defendant Sawyer, accompanied by Officer Kathleen Burns, responded to the Home Club and saw Deputy Zaccheo running after a maroon Nissan Altima fleeing the parking lot. (Dkt. No. 99-1, at 582, 584–85). Sawyer testified that Zaccheo "was shouting at the vehicle, giving him commands to stop, and they failed to do so." (*Id*. at 582–83). Sawyer was advised that the Nissan contained "suspects from a shooting." (*Id*. at 588). Sawyer got in his car and pursued the vehicle. (*Id*. at 582, 586). He had received a description of "the [license] plate and the vehicle," (*id*. at 617), and was informed that "a subject was shot by" the suspects. (*Id.*).

Town of Lloyd Police Sergeant Kalimeras responded to the Home Club, but by the time he arrived, he was advised by Deputy Zaccheo that the "suspects left in a maroon vehicle heading south." (*Id*. at 743). Kalimeras then left the Home Club, with Zaccheo, heading south on Route 9W. (*Id*. at 744–45). After driving for a "few miles" Kalimeras and Zaccheo caught up to

---

[3] The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 99-5, 100-1, 101-10), their responses thereto (Dkt. Nos. 106–08), and the attached affidavits, declarations, exhibits, and depositions. The State Defendants have included, as an exhibit to their motion, a CD with footage from dashboard cameras in the police vehicles driven by the Town of Lloyd defendants. (Dkt. No. 99-1, at 2; Dkt. No. 102). The CD contains two files. The Court has included relevant facts from them and identifies them by the end of their filenames, "7F330" and "7F332" respectively. The facts are taken in the light most favorable to the Plaintiffs. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[4] The venue is sometimes referred to as the Home Bar. The Court will refer to it as the Home Club.

the vehicle which "[Zaccheo] identified . . . as the car that was involved." (*Id*. at 746). After he caught up to the vehicle, Kalimeras estimated that he pursued it for "[b]etween one and two" miles before it stopped. (*Id*. at 749).

Town of Lloyd Police Officers, Defendants Esposito and Zani, were in their vehicle when they were "advised that [officers] were responding to a shooting at the Home [Club]." (*Id*. at 681–82). A subsequent call gave them information for the suspect vehicle and informed them that the suspects were possibly armed. (*Id*. at 683). "As soon as that . . . transmission ended, Officer[s] Zani and [Esposito] saw the vehicle pass [them] going" the opposite direction. (*Id*. at 684–85). The two turned around and joined the pursuit. (*Id*. at 685).

New York State Police Troopers, Defendant Filli and Chris Curley, responded to a radio call, indicating that there was "a shooting at the Home [Club]" off of Route 9W as well as "a description of a vehicle." (Dkt. No. 99-1, at 289–90). Filli and Curley joined the Town of Lloyd officers in pursuit of the Nissan. (Dkt. No. 99-5, ¶¶ 8–9; Dkt. No. 106, ¶¶ 8–9). Although the Nissan did not come to a stop initially, "despite the officers having activated their vehicles' lights," the vehicle eventually stopped "in the right-most southbound lane of Route 9W." (Dkt. No. 99-5, ¶¶ 12–13; Dkt. No. 106, ¶¶ 12–13). Officers testified that the Nissan was driving "with no headlights on." (Dkt. No. 99-1, at 684; *see also id.* at 291, 600).

Ulster County Sheriff's Deputy Defendant Riley, who was accompanied by Deputy Matt Brophy, testified that he was advised "a red vehicle" "left the nightclub" and was "occupied by people involved in the shooting." (Dkt. No. 99-1, at 481, 486). Riley and Brophy arrived south of the Nissan's location after the car had stopped and approached the car by foot. (*Id*. at 488).

Plaintiff Gordon was driving the Nissan, and Plaintiff Smith was in the right backseat; Dimitri Mosley and Anthony Allen[5] were also in the vehicle—seated in the passenger seat and rear left backseat respectively. (Dkt. No. 99-5, ¶ 3; Dkt. No. 106, ¶ 3).

### B. Smith Throws a Gun out of the Car, and Gordon is Shot

As Riley, Sawyer, Zani, Kalimeras, and Esposito approached the car with their guns drawn, (Dkt. No. 102, 7F332 at 4:04:04), Filli and Curley remained "thirty feet behind the rear of the suspect vehicle, slightly off the driver's side." (Dkt. No. 99-5, ¶ 19; Dkt. No. 106, ¶ 19). Sawyer and Esposito testified that the Nissan's windows were not tinted. (Dkt. No. 99-1, at 575, 692). Sawyer also testified that he recalled the area was "well lit" and that he believed the "area does have street lights." (*Id.* at 607). At this point, as counsel for Plaintiffs conceded at oral argument, Riley and Sawyer "had reliable information from multiple police sources that there had been a shooting at the Home Club with at least one known victim and that the suspects in that shooting were in" the Nissan. (Dkt. No. 100-23, at 10).

Defendants assert that they were giving the Nissan's occupants commands. (Dkt. No. 99-1, at 496, 498–99, 604–05; 694, 759), but that the car's occupants did not comply; some defendants testified that the occupants continued talking amongst themselves. (*Id.* at 505, 608, 693, 759). Zani testified that it "appeared that [the car's occupants] were attempting to discard or hide items in the car."[6] (*Id.* at 849). Smith testified that all he could hear was the "loud blaring of sirens" and that he did not hear any instructions or commands from the police officers. (*Id.* at

---

[5] The State Defendants appear to mistakenly refer to Anthony Allen as Anthony Gordon in their statement of material facts. (Dkt. No. 99-5, ¶ 3).

[6] The rear passenger door was briefly opened and then closed as the officers approached. (*See* Dkt. No. 102, 7F332 at 04:03:59).

70). Sirens and some officer commands are audible on the dashcam videos. (Dkt. No. 102, 7F330 at 04:00:35, 7F332 at 04:03:59).

Riley, Sawyer, and Zani—positioned on the driver's side of the Nissan—testified that they tried to open the driver's side doors but that the doors were locked. (Dkt. No. 99-1, at 502, 613, 883–84; Dkt. No. 102, 7F332 at 4:04:19). The officers then tried to "break into the vehicle in order to arrest the occupants," using their batons and flashlights to break the Nissan's windows. (Dkt. No. 99-5, ¶ 18; Dkt. No. 106, ¶ 18; Dkt. No. 102, 7F332 at 04:04:21).

Kalimeras and Esposito were positioned "toward the right rear passenger door" of the Nissan. (Dkt. No. 99-5, ¶ 20; Dkt. No. 106, ¶ 20). Kalimeras approached the car with his gun out, pointed at the passengers in the backseat, "giving commands, yelling show me your hands, show me your hands." (Dkt. No. 99-1, at 758). Kalimeras stood by the door for "less than a minute" before he tried to open it and was able to do so. (*Id.*). After he did, he saw Smith and "tried to pull him out of the car" to "detain" him until the officers "could determine who is in the car and determine whether they[] [were] involved in the shooting or not." (*Id.* at 761). Smith testified that Kalimeras "tried to rip" him out of the car by his shoulder. (*Id.* at 764). Smith further testified that "another officer," presumably Esposito, stuck a gun "into the car door" and "in [Smith's] face." (*Id.* at 71–72; Dkt No. 102, 7F332 at 04:04:38). Smith "had [his] hands on the front headrest while [Kalimeras] was pulling [him]." (Dkt. No. 99-1, at 73). Kalimeras testified that, at one point, he "believe[d]" he lost his grip on Smith. (*Id.* at 762). Around this time, Smith says that he saw a "gun in the front console area" and testified that he "was scared" that Defendants "will see the gun and they'll shoot [him]." (*Id.* at 74, 76). Smith picked up the gun "in a sweeping motion" with his palms facing upward to "try to surrender it to the police officer and dropped it . . . at the ground by [Kalimeras's] foot." (*Id.* at 75, 762). Kalimeras "saw

[Smith's] hand drop something, . . . looked down, saw what appeared to be a handgun, . . . and kicked it away." (*Id.* at 764).[7]

While these events unfolded, as Sawyer and Riley were positioned near the driver's door of the Nissan trying to break the window, Sawyer testified that he could "see the driver's hands" and that Gordon's hands were "[d]own by his waistband" on "his lap." (Dkt. No. 99-5, ¶ 23; Dkt. No. 106, ¶ 23; Dkt. No. 99-1. at 619). Sawyer testified that, as Riley was trying to break the driver's window, "[u]pon Deputy Riley's second to third swing," Sawyer saw Gordon pull out a gun. (*Id.* at 624–25). Specifically, Sawyer testified that he saw Gordon reach his arm across his body with his left hand toward the right side of his waist and draw a "[r]evolver style handgun," and that Gordon "pull[ed the gun] out towards" him and Riley and was "in the process of raising it towards [their] direction out the window." (*Id.*). Sawyer testified that when he saw the gun, he yelled "gun" and shot Gordon "immediately." (*Id.* at 626, 629–30). It is undisputed that Sawyer "gave no warning" prior to firing and that "he intended to fire his weapon." (Dkt. No. 99-5, ¶ 26; Dkt. No. 106, ¶ 26).

Riley testified that he tried to break the driver's side window, first by hitting it with his hand, then by kicking, and then by hitting it with his baton. (Dkt. No. 99-1, at 502). While he was hitting the window, Riley testified that Gordon was hunched over to his right as if he was having a conversation with the people in the vehicle and that he did not see that as a threat at that time. (*Id.* at 518). Riley testified that after the baton "did not break the glass," he took a step back to holster his baton and drew his gun to provide cover to the other officers. (*Id.* at 508–09). As he was drawing his firearm, he testified that he heard Sawyer say, "what is he doing." (*Id.* at 508–

---

[7] Although Smith testified that he threw the gun out of the car "simultaneous" to the gunshots going off and seeing Gordon "slump[] toward the center console area," (Dkt. No. 99-1, at 76–77), based on the dashcam videos and Kalimeras's testimony, it appears that Smith threw the gun out prior to Gordon being shot. (*Id.* at 763–64; *see generally* Dkt. No. 102).

10, 514). Then, as Riley was still in the process of drawing his gun, he heard Sawyer say "gun," and Sawyer fired a shot at Gordon. (*Id*. at 509–10, 514). Riley testified that he then took aim for Gordon's chest and fired twice. (*Id.* at 515–16). Riley testified that prior to firing, he could not see Gordon's hands because Gordon's hands were "below the [car's] window line." (*Id.* at 510). When Sawyer said gun and fired, Gordon, according to Riley, was still "hunched over" to his right, (*id.* at 516–17), and "continued to be turning towards [Sawyer and Riley] while it looked like he was lifting his arm." (*Id.* at 517). Riley testified that he never saw a gun inside the car, but after hearing Sawyer say "gun," Riley "perceived that [Gordon] still had a gun and was coming towards [Riley]." (*Id.* at 510, 518–19.). Riley only shot twice because he "thought the threat stopped at that point" and the "car rolled across the roadway."[8] (*Id.* at 516). The video shows that the passenger in the backseat behind Gordon moved forward and to the right, closer to Gordon, several times, including just before the first gunshot. (Dkt. No. 102, 7F332 at 04:04:00–50).

Zani, who—along with Sawyer and Riley—was also on the driver's side of the car, testified that "[he] never" saw the driver's hands as he looked into the vehicle. (Dkt. No. 99-1, at 852). Zani testified that when he heard Sawyer yell "gun," he was "attempting to see" into the back window of the vehicle. (*Id.* at 854). Zani did not consider firing his gun because "he did not see a threat." (*Id.* at 867). Zani testified that he saw "a movement of the shoulder from the driver" but could not recall which shoulder. (*Id.* at 854). Zani also testified that he could not see anything below Gordon's head and shoulders, (*id.* at 832–33), and that he could not see what Gordon was doing with his hands. (*Id.* at 833). Zani testified that immediately before he heard Sawyer yell "gun," he was yelling at the backseat passenger to show his hands. (*Id.* at 858). Zani testified that he "did not" see a gun inside the car before the shooting. (*Id.* at 831).

---

[8] The video shows that the car begins to move after the first shot is fired. (Dkt. No. 102, 7F332 at 04:04:49).

Gordon has provided varying descriptions of his memory of what happened. In a statement given to officers shortly after 8:00 a.m. that morning at St. Francis Hospital, (Dkt. No. 100-14, at 3), Gordon repeatedly said that he did not remember how he got shot. (*Id.* at 16, 20, 21, 33). Gordon stated, "I passed out wherever I stopped at, and I fell out of the car, and I felt like I got shot. I did not have no gun." (*Id.* at 28). Gordon said that he was "drunk out of his mind" and high. (*Id.* at 22, 27).

While Gordon provided a few more details regarding the stop in his deposition, he consistently testified that he did not remember the moment he was actually shot. (Dkt. No. 99-1, at 183–85, 217, 265). First, he testified that once he pulled over, one cop "came to [his] side, other cop went to the [passenger side], told us to put our hands up." (*Id.* at 183). After the officers told Gordon to put his hands up, Gordon testified that the "[l]ast thing [he] can remember after that was I was passed out on the floor, felt like I was gonna die 'cause I felt pain, I felt I had been shot." (*Id.* at 183–84). Gordon did not recall getting out of the vehicle or hearing gunshots. (*Id.* at 184). Shortly after, at the same deposition, Gordon testified that the "last thing [he] remember[s] is . . . pull[ing] over, put[ting] [the] car in park" and then "the next thing [he] kn[e]w" he was "on the ground bleeding and felt [he] had been shot." (*Id.* at 185). Later in the deposition, Gordon testified that the last thing he remembered was an officer saying, "put your hands up" and that the next thing he remembered was lying on the ground outside the car in pain from what he believed were gunshots. (*Id.* at 217). Finally, Gordon testified that he remembered the officers approaching the Nissan, and that he planned to "[f]ollow [the officers'] orders." (*Id.* at 262). Gordon testified that, as the officers came up to the car, he was "facing forward" with his "hands on the steering wheel" as an officer was "by [Gordon's] window with the flashlight saying, '[p]ut your hands up.'" (*Id.* at 264). Gordon testified that he complied with that

instruction, (*id.*), and that "[a]fter he put [his] hands up," the next thing he remembers is being on the ground after being shot. (*Id.* at 264–65).

Kalimeras, who was on the other side of the vehicle, at the right rear passenger door, testified that he never saw a gun inside the Nissan. (*Id.* at 765–66, 770). Kalimeras testified that he did not perceive any threat inside the Nissan besides the fact that the passengers were suspected "shooters from the nightclub." (*Id.* at 765–67). Kalimeras further testified that as he was trying to pull Smith from the passenger's side backseat, just before the shooting, "he was not focused on the driver" and that he "didn't see it" in response to a question at his deposition as to whether "he could see the driver['s body] position." (*Id.* at 775).

Esposito, who was next to Kalimeras on the car's passenger side, (Dkt. No. 102, 7F332 at 04:04:40), testified that as soon as Kalimeras "open[ed] the [rear passenger side] door," he "hear[d] a gunshot,"[9] saw "a muzzle flash and then some smoke." (Dkt. No. 99-1, at 698). "[F]rom [Esposito's] angle," on the passenger's side of the vehicle, he did not "see anybody in the car," including "the operator" "reach for anything." (*Id.* at 722–23). Esposito testified that he was "going back and forth between looking at the" Nissan and a Jeep that was stopped in front of the Nissan "trying to figure out if [the Jeep's occupants] might have been involved or not." (*Id.* at 697). From the dashcam videos it appears that just prior to and when the first shot is fired, Esposito was looking inside the Nissan. (Dkt. No. 102, 7F330 at 04:01:25, 7F332 at 04:04:48). At his deposition, Esposito is asked whether he saw "any further movements inside the car?" (Dkt. No. 99-1, at 723). He answered, "[y]es" and that "just before we were going to try to stop them they were all moving around, especially Mr. Smith was moving around quite a bit before

---

[9] The video shows that approximately 20–25 seconds passed from when Kalimeras opened the rear passenger's side door until the shots are fired. (*See* Dkt. No. 102, 7F332 at 04:04:28–50).

we stopped him." (*Id.*). When Esposito was asked if "immediately before the shooting" he saw "any kind of movement," (*id.* at 723), he answered, "[n]o." (*Id.*).

Smith, from his position in the backseat of the Nissan, testified that he could not see Gordon's "front profile," that he "couldn't tell you if something was in [Gordon's] waist," and that he didn't "recall" if Gordon moved either of his arms to the left or right. (*Id.* at 146–47). Smith further testified that he could not say whether he saw Gordon reach towards the console or turn his body towards the driver's side of the car or the passenger's side of the car. (*Id.* at 147). Smith described the scene as "mad chaotic," and said that he did not know what anyone was saying. (*Id.* at 73–74).

Neither Kalimeras nor Esposito, who were across the vehicle near Smith by the rear passenger seat, heard Sawyer yell gun. (*Id.* at 698–99, 767). Filli, who was "thirty feet from the [Nissan], did not hear Sawyer shout 'gun.'" (Dkt. No. 99-5, ¶ 28; Dkt. No. 106, ¶ 28). Filli testified that if somebody "had yelled gun, [he] wouldn't be able to clearly make that out" because there "were so many different commands and the sirens were going from the police cars." (*Id.* at 303).

Following Sawyer's gunshot, the Nissan began to move. (Dkt. No. 102, 7F332 at 04:04:49). About two seconds later, Riley fired two gunshots in quick succession. (*Id.* at 04:04:51). The Nissan then began to "travel to the left, crossing both lanes of traffic [on Route 9W], eventually coming to rest off to the left hand side of the road." (Dkt. No. 99-5, ¶¶ 27, 31; Dkt. No. 106, ¶¶ 27, 31; Dkt. No. 102, 7F332 at 04:04:50).[10] After the shooting, while Gordon was on the ground, Sawyer "conducted a quick pat-down for any weapons." (Dkt. No. 99-1, at

---

[10] New York State Troopers Jordan and Khan arrived at the scene as the vehicle began to travel across Route 9W; "neither Jordan nor Khan hear[d] the gunshots[] or observe[d] the officers fire their weapons." (Dkt. No. 99-5, ¶¶ 32, 34; Dkt. No. 106, ¶¶ 32, 34). The two had been advised that the shooting suspects had left the Home Club in a Nissan Altima. (Dkt. No. 99-2, ¶¶ 3, 5–7; Dkt. No. 99-4, ¶¶ 3, 5–7).

657–58). Sawyer did not recover anything. (*Id.* at 658). The driver's door was open, and Sawyer looked inside the "immediate area" of the vehicle's driver's side and did not see a gun. (*Id.*). Sawyer testified that he only searched the driver's side. (*Id.*). Zani testified that after the incident, he and Sawyer "walked past a gun . . . on the side of the road" and Sawyer said, "that's not the gun I saw." (*Id.* at 861, 875). As described further below, there were two guns in the car. *See infra* Part II.D. At his deposition, Gordon testified that Smith and Mosley had guns in the back seat. (*Id.* at 251).

### C.     Smith Flees from the Nissan

After the Nissan came to a stop, (*Id.* at 81), Smith "exited the Nissan." (Dkt. No. 99-5, ¶ 35; Dkt. No. 106, ¶ 35). Smith testified that he had his "hands up" and told the officers, "I don't have anything in my hands. Don't shoot me." (Dkt. No. 99-1, at 81). The officers instructed Smith to "[f]reeze" and "get down." (*Id.*) Smith then took off running toward a wooded area. (*Id.* at 84–85). Filli, Jordan, Khan, Kalimeras, and Esposito pursued. (Dkt. No. 99-5, ¶ 38; Dkt. No. 106, ¶ 38). Smith could hear officers behind him saying "[s]top or I'm going to shoot" but kept running. (Dkt. No. 99-1, at 85–86).

As Jordan chased Smith, when Smith was "[a]pproximately five" or "ten" feet ahead of him, Jordan attempted to tase Smith, but his taser malfunctioned. (*Id.* at 375). Jordan subsequently caught up to Smith and grabbed "the back of [his] hands" and the waistband of his pants, causing Smith to fall. (*Id.* at 88, 382). Jordan also fell, and Smith was able to continue fleeing. (Dkt. No. 99-5, ¶ 41; Dkt. No. 106, ¶ 41). Filli testified that he witnessed Smith "swing[] in a backwards motion trying to . . . make contact with [Jordan] with his right arm." (Dkt. No. 99-1, at 38). Jordan testified that after he "grabbed at [Smith's] pants and pulled down," his "grip didn't hold," and Smith "resume[d] running." (*Id.* at 381–82).

Filli "continued to pursue Smith and caught up with him seconds later." (Dkt. No. 99-5, ¶ 44; Dkt. No. 106, ¶ 44). The officers' and Smith's versions of the events diverge here. Filli testified that he "caught up with Smith, and tackled him to the ground by lowering [his] shoulder into [Smith's] back and grabbing him around his waist." (Dkt. No. 99-3, ¶ 21). According to Filli, Smith "landed on top of [him]" and "attempted to strike or shove [Filli] twice in the chest." (*Id.* ¶ 22). To "prevent Smith's escape and protect" himself, Filli "struck Smith once in the face" "within a few seconds of tackling him" before "complet[ing] the arrest of Smith with the assistance of Trooper Jordan and other officers." (*Id.* ¶¶ 23–24). Jordan arrived to find Filli "on Smith's back" and helped Filli "effectuate cuffing" Smith. (Dkt. No. 99-1, at 387, 390). Jordan estimated that it took "maybe a minute" from the time Jordan arrived and saw Filli on Smith's back until they were able to get Smith into handcuffs. (*Id.* at 390). Jordan asserts that as he was attempting to handcuff Smith, Smith was using "muscle force to prevent his hand from coming down." (*Id.* at 391). Jordan also testified that Smith's body needed to be "rocked" because Smith's right hand was underneath his body being "pressed down by the weight of his own body and the weight of officers." (*Id.*).

When Esposito arrived, Smith was "not yet in cuffs." (*Id.* at 710). Esposito testified that he helped gain control of Smith's legs by putting both of his knees on his legs, (*id.* at 710–11), and that force was required to overcome Smith's resistance when he "was not letting us put him in handcuffs" by keeping his arms underneath him. (*Id.* at 715). Esposito did not see Smith try to attack any of the officers. (*Id.* at 715–16). According to Esposito, one officer said, "he's holding something," so Esposito searched Smith but found nothing. (*Id.* at 712).

Smith, by contrast, testified that after he broke away from Jordan, he "felt a very impactful forceful punch in the face, and then also like a simultaneous tackle around [his] waist."

(*Id.* at 92). Smith then "went black" and "crumbled," losing consciousness. (*Id.* at 91–92). When Smith came to, his "face was in the snow," and he was "being cuffed." (*Id.* at 99). As he was being handcuffed, an officer allegedly said, "[m]otherfucker, you run from us, we'll teach you." (*Id.* at 100). Smith was able to faintly make out some of the officers as he "wiggl[ed] [his] head." (*Id.* at 99). Smith estimated four to seven officers were around him, (*id.*), including Jordan, Filli, and Esposito. (*Id.* at 151–52). Smith was "moving" his head and back "as the officers were hitting [him]." (*Id.* at 100). Smith was bleeding, and his face was "mushed into the snow" (*Id.* at 101). Smith estimated that before the officers completed handcuffing him, he was struck two to five times in the right side of the face, eight times in the lower back, five to six times in the shoulders, and one or three times in his arms. (*Id.* at 103–04, 107).

Smith testified that after he was handcuffed the officers continued to strike him for "approximately . . . 45 seconds" to a "minute and a half." (*Id.* at 109). He testified being struck an additional five to six times in the right side of his face, five times in the lower back, five to six times in the shoulder, and four times in the arms. (*Id.* at 103–04, 107). Smith also testified that the handcuffs were applied too tightly, noting that he "had welts on his wrists" as a result. (*Id.* at 110). After Smith was handcuffed, a defendant "was trying to grab [him] up by [his] neck" to get Smith to stand up, which he described as "a choking kind of thing." (*Id.* at 108). Smith estimated that—from the time he regained consciousness until he was placed into an ambulance—he was struck from his "waist up . . . over 30 times." (*Id.* at 105).

Filli and Jordan deny using any more force than necessary to handcuff Smith and deny "observ[ing] any other officer strike or otherwise use physical force on Smith" other than what was required to secure him. (Dkt. No. 99-1, at 708–09; Dkt. No. 99-2, ¶ 21; Dkt. No. 99-3, ¶ 29). Esposito testified that when he arrived to where Smith was being secured, Smith was already on

his stomach. Esposito did not see any punches, kicks, or injuries to anybody. (Dkt. No. 99-1, at 709).

After the incident, Smith and Gordon were both taken to St. Francis Hospital. (*Id.* at 113–14, 187). Smith received an X-ray, CT scans, and sutures under his right eye. (*Id.* at 113–14). Gordon's gunshot wounds were ultimately treated at the Ulster County Jail infirmary for about three months. (*Id.* at 190).

### D.    Gordon's Guilty Plea to Criminal Possession of a Firearm

On December 19, 2014, Gordon pled guilty to criminal possession of a firearm, a Class E felony. (Dkt. No. 100-8, at 6; Dkt. No. 100-9, at 3). In his plea colloquy, under oath, Gordon admitted that on January 24, 2015 he had a Rossi .38 caliber revolver in his waist. (Dkt. No. 100-9, at 12, 15–16). Gordon stated that Smith also had a gun that night; Smith's gun was a semi-automatic. (*Id.* at 16–17).[11] Gordon said Smith threw his gun out the vehicle. (*Id.* at 17).  Gordon said that he was shot after Smith threw his gun out of the vehicle, and after Gordon pulled out the gun. (*Id.*). Gordon said that he "passed the gun" to Mosley, who was in the back seat of the car. (*Id.* at 17).[12]

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

---

[11] Smith was convicted of second-degree criminal possession of a weapon following a trial. (Dkt. No. 99-5, ¶ 62; Dkt. No. 106, ¶ 62).

[12] The officers testified that two guns were recovered from the scene. (Dkt. No. 99-1, at 546, 717, 769, 862–63, 875–77). The first was the gun Smith threw from the vehicle. (*Id.* at 402, 717, 770). It is not clear on this record where the second gun was found. (*Id.* at 328–29, 402, 545–46, 645, 717, 769, 876).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

## IV. DISCUSSION

### A. Gordon's Plea Allocution

Riley argues that Gordon is collaterally and judicially estopped from "denying the facts admitted in his plea" and which "underlie his criminal conviction" for second-degree criminal possession of a firearm. (Dkt. No. 100-23, at 14–15). Riley maintains that "it is established for purposes of this summary judgment motion that he had a . . . semi-automatic revolver in his waistband when he was stopped on 9W after leaving [t]he Home Club and that [Gordon] was

shot after he pulled that firearm out of his waist." (Dkt. No. 100-23, at 16). Plaintiffs counter that the "exact context of the events leading up to this police shooting are wholly absent from the record in the plea allocution." (Dkt. No. 105).

Collateral estoppel, or issue preclusion, "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) (quoting *Ryan v. N. Y. Tel. Co.*, 62 N.Y.2d 494, 478 (1984)). Any issue of preclusive effect depends on the "specific facts and circumstances of each case," and the Court looks to the law of New York, where the judgment was entered. *Id*. Under New York law, the doctrine applies "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *Sullivan*, 225 F.3d at 166 (quoting *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 349 (1999)). The "burden of proof with respect to whether an issue is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion." *Id.*

Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993). "A party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc.*, 84 F.3d 622, 628 (2d Cir. 1996). Judicial estoppel serves to "'preserve the sanctity of the oath' and to 'protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.'"

*Perlleshi v. Cty. of Westchester*, No. 98-cv-6927, 2000 WL 554294, at *5, 2000 U.S. Dist.

LEXIS 6054, at *14–15 (S.D.N.Y. Apr. 24, 2000) (quoting *Simon v. Safelite Glass Corp.*, 128

F.3d 68, 71 (2d Cir. 1997) (internal quotation marks omitted)).

Following the events of January 25, 2014, Gordon pled guilty to criminal possession of a

firearm, a Class E Felony. (Dkt. No. 100-8, at 6; Dkt. No. 100-9, at 3).[13]

A person is guilty of criminal possession of a firearm when he or she:

(1) possesses any firearm or;

(2) lawfully possesses a firearm prior to the effective date of the chapter of the laws of
two thousand thirteen which added this section subject to the registration requirements of
subdivision sixteen-a of section 400.00 of this chapter and knowingly fails to register
such firearm pursuant to such subdivision.

N.Y. Penal Law § 265.01-b

In the allocution accompanying his guilty plea on December 5, 2014, Gordon admitted

that at the time he was stopped on the night of January 25, 2014, he had a Rossi .38 caliber

revolver in his possession. (Dkt. No. 100-9, at 12, 16). In his sworn allocution, Gordon further

testified that the gun was located on his waist and that he was "shot by an officer after he pulled

out the gun," "passed the gun to the back of the seat," and gave the gun to Mosley. (*Id.* at 17).

Gordon stated that that Smith also had a gun on him; Smith's gun was a semi-automatic. (*Id.* at

16–17). Gordon testified that Smith threw his gun out of the vehicle before Gordon was shot. (*Id.*

at 17).

Gordon's admission that he possessed the .38-caliber revolver on January 25, 2014 was

necessarily determined and material in the criminal possession case, and Gordon is collaterally

estopped from denying that in these proceedings. The Court, however, does not consider the fact

---

[13] Although Gordon was arrested for criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03,
the record reflects that he ultimately pled guilty to criminal possession of a firearm, N.Y. Penal Law 265.01-b. (*See*
Dkt. No. 100-1, ¶ 26; Dkt. No. 108, ¶ 26; Dkt No. 100-8, at 6; Dkt. No. 100-9, at 4–5).

that Gordon possessed this firearm in determining whether the use of force was reasonable because the Court has to evaluate the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones v. Parmley*, 465 F.3d 46, 61 (2nd Cir. 2006) (Sotomayor, J.).

The Court will consider the other statements Gordon made under oath as part of the evidence in the summary judgment record, but collateral estoppel does not apply to these statements because they do not concern issues "necessarily decided and material" in the criminal possession case. *Sullivan*, 225 F.3d at 166 (citation omitted).[14]

### B.    Deadly Force Against Gordon

The "Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "The Fourth Amendment test of reasonableness 'is one of objective reasonableness,'" *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (quoting *Graham*, 490 U.S. at 399). As such, "the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (Sotomayor, J.)). In balancing those interests, the Court considers "at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was

---

[14] Nor is Gordon judicially estopped by his admission that he pulled out the gun and passed it to Mosely. Even assuming that Gordon's statements constitute taking an inconsistent factual position in a prior proceeding, Riley has filed to establish that "the prior inconsistent position was adopted by the first court in some manner." *AXA Marine & Aviation Ins. (UK) Ltd.*, 84 F.3d at 628.

actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).

To determine whether a use of force is reasonable, the Court evaluates the record "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones*, 465 F.3d at 61 (quoting *Graham*, 490 U.S. at 396). Moreover, the Court must "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Id.* (quoting *Graham*, 490 U.S. at 397). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 397 (internal quotations and citation omitted). With respect to deadly force, it is objectively reasonable for an officer to use deadly force "to apprehend a suspect" where the officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003); *Tennessee v. Garner*, 471 U.S. 1, 3, 11 (1985).

### 1.    Sawyer's Use of Deadly Force

The Town Defendants argue that Sawyer's use of deadly force was reasonable and that, even if not, Sawyer is entitled to qualified immunity. The Town Defendants argue that Sawyer "was attempting to arrest a fleeing suspect who was fleeing from a crime scene where shots were fired" when Sawyer "observed the suspect's weapon and was immediately fearful for his safety and the safety of the other officers at the scene." (*Id.*). Plaintiffs argue that Sawyer is not entitled to summary judgment on Gordon's excessive force claim because Gordon "had remained stopped in his vehicle, with his hands on the steering wheel," (Dkt. No. 105, at 11), and that

Sawyer's contentions that he "observed a weapon and fired" is simply a disputed issue of fact. (*Id.*).[15]

Considering the entire record here, including the fact that Gordon is estopped from denying that he possessed a .38 caliber revolver in his waist on January 25, 2014, it would appear that the shooting occurred, as Gordon himself described in his plea allocution: he was shot "after [he] pulled out the gun . . . and after he "passed the gun to the back of the seat" to Mosely. (Dkt. No. 100-9, at 17). Sawyer described the gun he saw as a revolver. (Dkt. No. 99-1, at 624). Also, according to Zani, upon seeing the gun on the road after the shooting, Sawyer said that was not the gun he saw, (*id.* at 624, 861), which is consistent with the fact that Smith's gun, according to Gordon's plea allocution, was not a revolver; Smith's gun, according to Gordon, was a semi-automatic. (Dkt. No. 100-9, at 16–17). While it is a close call, the Court, however, cannot say that the record is so clear that there are no material issues of fact. The act of removing the gun to pass it to Mosely in the back seat is not consistent with Sawyer's testimony that Plaintiff turned the gun toward the officers after drawing it out from his waist. Gordon's terse admissions made during his plea allocution do not explain when he had the gun in his waist; when he removed the gun; and when he passed the gun to Mosely. (*See id.*). And Zani testified seeing the occupants

---

[15] Plaintiffs make two further arguments. First, they argue that the traffic stop here "was not held in accordance with police training." (Dkt. No 105, at 7). The Court notes, however, that "local police enforcement practices generally have no bearing on the reasonableness of a search or seizure." *United States v. Wilson*, 699 F.3d 235, 243 (2d Cir. 2012). Second, Plaintiffs argue that summary judgment should be denied because that there is a "disputed issue of fact" as to whether Plaintiffs heard the officers' commands as they approached the car. There is no dispute that Gordon, who was inside the vehicle with the door closed, heard commands; he repeatedly testified that the officers directed the occupants to put their hands up. And, in any event, because excessive force and qualified immunity must be analyzed from "the judgment of reasonable officers on the scene" rather than with the "20/20 vision of hindsight," *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (quoting *Graham*, 490 U.S. at 393), the Court finds this argument unconvincing. Even as to Smith, the officers could reasonably have interpreted his inaction as non-compliance. *See Garza v. Briones*, No. 18-40982, 2019 WL 6271480, at *5, 2019 U.S. App. LEXIS 35281, at *11 (5th Cir. Nov. 25, 2019) (rejecting the argument that the plaintiff, who had headphones in his ears, could not hear officer commands and explaining that "[e]ven if the [plaintiff] could not hear the officers, it can't reasonably be suggested that he wasn't aware of their presence; more than a dozen officers with their firearms drawn and squad cars with lights flashing were surrounding him. Regardless of why [the plaintiff] was noncompliant, defendants could justifiably conclude that his noncompliance was a threat to their safety").

"attempting to discard or hide items in the car" as he approached. (Dkt. No. 99-1, at 849).

Finally, although one would not expect all of the officers to have seen every move made by each

of the four occupants during the seconds of this danger-fraught stop, three officers were near the

driver's window, and Sawyer was the only officer who saw a gun. Thus, this is not a case in

which there are only "small differences," insufficient to create a genuine issue of fact. *Cf.*

*Fortunati v. Campagne*, 681 F. Supp. 2d 528, 537–38 (D. Vt. 2009) ("Small disagreements over

the gun's exact positioning are not enough to create a genuine issue of fact, given that [Plaintiff]

grabbed his gun and appeared ready to shoot."), *aff'd sub nom. Fortunati v. Vermont*, 503 F.

App'x 78 (2d Cir. 2012), *as amended* (Dec. 3, 2012).[16] Accordingly, viewing the facts in the

light most favorable to Plaintiffs, the Court finds a genuine dispute of material fact as to whether

Sawyer had "probable cause to believe that [Gordon] pose[d] a significant threat of death or

serious physical injury to" himself or the others on the scene, and thus whether his use of deadly

force was reasonable. *Garner*, 471 U.S. at 3.

## 2.     Sawyer's Entitlement to Qualified Immunity

Sawyer argues that, even if his use of force were unreasonable, he is entitled to qualified

immunity. (Dkt. No. 101-9, at 18–20). Plaintiffs counter that "qualified immunity arguments are

impossible to assess due to the numerous issues of fact confronting the officers at the time the

force was used." (Dkt. No. 105, at 11–12).

 "Qualified immunity is an affirmative defense on which [Defendants have] the burden of

proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). At the summary judgment

stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) whether the

---

[16] The Court notes but has not relied on Gordon's inconsistent deposition testimony that he last remembers having his hands up in the air, as directed by the officers. Even crediting Gordon's testimony that at one point he had his hands on the wheel and that he then put his hands up, in his deposition Gordon did not provide any account of what happened after he put his hands up.

facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right" and (2) "whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). The Court has discretion to decide which of the two prongs should be addressed first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656.

Because material factual disputes remain as to reasonableness of Sawyer's use of force, at this stage, qualified immunity is inappropriate. *See Hemphill v. Schott*, 141 F.3d 412, 417–18 (2d Cir. 1998) (reversing grant of qualified immunity where there were factual disputes as to movements made by the plaintiff prior to the use of deadly force and explaining that "summary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues [that] remain"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 505 (N.D.N.Y. 2010) ("[I]t is impossible to 'determine whether [Defendant] reasonably believed that [his] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded.'") (quoting *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999)). Accordingly, qualified immunity is denied as to Sawyer.

### 3.      Riley's Use of Deadly Force

Riley argues that his use of force against Gordon was reasonable and that, even if the force was unreasonable, he is entitled to qualified immunity. Specifically, Riley argues that he was "flooded with information supporting the reasonableness of his decision to fire his weapon" at Gordon. (Dkt. No. 100-23, at 17). Riley notes that he had been "advised of incident [at the Home Club] minutes earlier that involved multiple gun shots and a victim" and that the vehicle

"contained a suspect in that shooting." (*Id.* at 18). Riley further argues that Sawyer's statement, "gun" followed by Sawyer's shot and Riley's perception that Gordon's hands had been "below the [car's] window line," (Dkt. No. 99-1, at 510), and that Gordon "continued to be turning towards [Defendants Sawyer and Riley] while it looked like he was lifting his arm." (*Id.* at 517). Plaintiffs respond that "[s]everal disputed issues of fact underlie Riley and Sawyer's decisions to fire their weapons and use deadly force." (Dkt. No. 105, at 7). Plaintiffs claim that it was only "Sawyer who claims to have actually witnessed plaintiff reach for a gun," (*id.* at 10), and that even Riley, "who fired his weapon twice and is also positioned within only feet of Sawyer, claims not to have seen [Gordon] in possession of a weapon." (*Id.*).

While there are factual issues regarding whether Sawyer saw Gordon pull his revolver out of his waist and whether Gordon turned toward the officers, the Court finds no genuine dispute of fact that Sawyer verbally alerted to a gun. First, Sawyer and the two officers near him by the driver's side window—Riley and Zani—each testified that they heard Sawyer say "gun" prior to firing. Second, Kalimeras and Esposito—who were both positioned on the other side of the vehicle by the rear passenger's side door—did not testify that no warning was given. Rather, they testified only that they did not hear Sawyer say "gun."[17] (Dkt. No. 99-1, at 303, 698–99, 767). Filli, who was thirty feet from the rear of the Nissan, testified the same. (Dkt. No. 99-5, ¶ 28; Dkt. No. 106, ¶ 28). Smith, who was inside the Nissan, described the scene as "mad chaotic" and testified that "the sirens were very, very loud," and that he did not remember hearing voices from the driver's side of the vehicle. (Dkt. No. 99-1, at 73–74, 145). Considering all of the

---

[17] Moreover, the Court finds Esposito's testimony—that he "[p]ossibly" would have heard one of the officers yell "gun" if an officer had done so—to be too speculative to create a genuine issue of fact. To defeat summary judgment, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *See Jeffreys*, 426 F.3d at 554 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). On this issue, the Court finds Plaintiffs have not met their burden.

evidence in the light most favorable to the Plaintiffs, the failure of other officers (and Smith) to hear Sawyer say gun does not create an issue of fact in light of Sawyer, Riley, and Zani's affirmative testimony that Sawyer said "gun." *See Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988) (explaining that "the plaintiff's testimony that he did not hear any warnings fail[ed] to present a question of material fact as to whether . . . in fact they were given" where the officer gave "positive testimony that he warned [the plaintiff] twice before firing a shot").

Accordingly, Riley's on-the-scene calculus included Sawyer saying "gun" as well as Sawyer firing one shot immediately thereafter. *See Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) ("The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."). The Court finds, then, that under the totality of the circumstances, Riley's decision to use deadly force—fire his gun twice—under the circumstances was reasonable because he had "probable cause to believe that [Gordon] pose[d] a significant threat of death or serious physical injury to" himself or the others on the scene. *Garner*, 471 U.S. at 3.

That is so even if the belief may have ultimately been mistaken. *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003) ("[C]laims that an officer made a reasonable mistake of fact that justified the use of [deadly] force are considered at [the summary judgment] stage of the analysis." (citing *Stephenson v. Doe*, 332 F.3d 68, 78 (2d Cir. 2003))). Moreover, courts both within and outside of this Circuit have found force reasonable where an officer relies on a fellow officer's warning about the imminence of a threat. *See Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 245 (E.D.N.Y. 2014) (finding reasonable force where it was "uncontroverted that [a defendant officer] only employed force against [the plaintiff] . . . after hearing [a fellow officer] say 'gun' or 'drop the weapon'"); *Marrow v. Amato*, No. 07-cv-401, 2009 WL 350601,

at *6, 2009 U.S. Dist. LEXIS 10580, at *5 (D. Conn. Feb. 12, 2009) (finding a mistaken belief as to whether a suspect or the officer's partner was firing shots, and subsequently firing himself, was reasonable); *McLenagan v. Karnes*, 27 F.3d 1002, 1005, 1007–08 (4th Cir. 1994) (finding reasonable the split-second use of deadly force against an unarmed, handcuffed suspect where a fellow officer yelled, "[t]he man has got a gun!" and where the shooting officer "could not see" whether the suspect "had a gun in his hands"). Accordingly, the Court finds that Riley's use of deadly force was reasonable.

### 4. Riley's Entitlement to Qualified Immunity

Even if Riley's use of force was unreasonable, he would be entitled to qualified immunity. The question for Riley becomes whether, viewing the facts in the light most favorable to Plaintiffs, it was clearly established on the date of these events that a police officer could not use deadly force in this danger-fraught traffic stop against a person in a vehicle containing four passengers, at least one of whom was suspected of previously firing a gun (where it was unclear which passenger may have done so), where passengers were not following officers' orders, and where another officer on the scene had just said "gun" and fired one shot.

To be clearly established, "a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018). The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *Wesby*, 138 S. Ct. at 589–90 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). While there need not be "'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* at 590 (quoting *al–Kidd*, 563 U.S. at 741–42); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The focus is on "whether the

officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

The Court is unaware of caselaw clearly establishing a Fourth Amendment violation in this circumstance. *See Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2614 (2019) (explaining that the "crucial question" under the qualified immunity analysis is "whether the official acted reasonably in the particular circumstances that he or she faced" (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014))). Moreover, as the Supreme Court has explained, "[n]o settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers." *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) (explaining that a late-arriving officer to a scene may assume that "proper procedures, such as officer identification, have already been followed"); *see also Breitkopf*, 41 F. Supp. 3d at 247 ("[E]ven assuming *arguendo* that [a defendant] used objectively unreasonable force, his belief in the lawfulness of his actions, in light of the circumstances before him— including, *inter alia*, [a fellow officer's] yelling of 'gun' and the proximity of the armed man to him—was objectively reasonable."). Accordingly, even if Riley's use of force was unreasonable, he is nevertheless entitled to qualified immunity because he did not violate clearly established law.

### C. Failure to Intervene to Prevent Deadly Force Against Gordon[18]

Sawyer also moves for summary judgment on Plaintiffs' failure to intervene claim.[19] Plaintiffs make two arguments in response. First, they argue that Sawyer "could have warned plaintiff that he would be shot" which would have "communicated to Riley that a firing was imminent" and would have allowed Riley to "assess or observe the threat himself." (Dkt. No. 105, at 16). Second, Plaintiffs argue that Sawyer "could have shot and then immediately raised his hand to demonstrate that the threat was past or otherwise not present." (Dkt. No. 105, at 16).

"A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)). Liability attaches on the theory that the officer, by failing to intervene, becomes a "tacit collaborator" in the illegality. *Id.* (quoting *O'Neill*, 839 F.2d at 12). For Plaintiffs to succeed on their failure to intervene claim, there must "have been a realistic opportunity to intervene to prevent the harm from occurring." *Felix v. City of New York*, No. 16-cv-5845, 2019 WL 4747958, at *6, 2019 U.S. Dist. LEXIS 168670, at *18 (S.D.N.Y. Sept. 30, 2019) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Here, even assuming Riley unconstitutionally used deadly force against Gordon, the Court finds Sawyer did not have a realistic opportunity to intervene to prevent Riley from doing

---

[18] Plaintiffs voluntarily discontinue their failure to intervene claims as to all Defendants stemming from the shooting of Gordon except for Sawyer's alleged failure to intervene to prevent Riley from shooting Gordon. (Dkt. No. 105, at 16).

[19] The Town Defendants argue that Plaintiffs may not press a failure to intervene claim against Sawyer for his failure to intervene against himself. (Dkt. No. 101-9, at 13). In response, Plaintiffs argue only that Sawyer failed to intervene to prevent Riley from shooting his weapon at Gordon. (Dkt. No. 105, at 16–17), so the Court does not address this argument.

so "given the fast paced nature of the encounter." *Crockett v. City of New York*, No. 11-cv-4378, 2015 WL 5719737, at \*7, 2015 U.S. Dist. LEXIS 131327, at \*22 (E.D.N.Y. Sept. 29, 2015). The undisputed evidence shows that Riley fired his two gunshots approximately two seconds after Sawyer's shot. (Dkt. No. 102, 7F332 at 04:04:50). *See Bah v. City of New York*, 319 F. Supp. 3d 698, 714 (S.D.N.Y. 2018) (finding a supervisor had no "realistic opportunity to intervene" where "the unrebutted evidence" showed the shooting was "over in an extremely brief period of time— perhaps two seconds"); *Alvarez v. City of New York*, No. 11-cv-5464, 2015 WL 1499161, at \*9, 2015 U.S. Dist. LEXIS 43403, at \*25 (S.D.N.Y. Mar. 30, 2015) (finding officers had "no realistic opportunity to intervene" where a "volley of bullets lasted only about seven to ten seconds"). Accordingly, summary judgment is granted on Gordon's failure to intervene claim against Sawyer.

### D. Excessive Force Against Smith

The Court now turns to the claims of excessive force that allegedly occurred after Smith fled from the Nissan. Three instances of force are at issue: (1) Filli's initial force used against Smith; (2) the alleged force used against Smith before the officers finished handcuffing him; and (3) the alleged force used against Smith after the officers completed handcuffing him. The Court takes each in turn. *See Tracy*, 623 F.3d at 97–99 (analyzing multiple uses of force arising from a single incident).

#### 1. Filli's Force Used to Smith's Face

To determine whether Filli's force used to Smith's face was objectively reasonable requires balancing the *Graham* factors, which include (1) the nature and severity of the crime leading to Smith's arrest; (2) whether Smith posed an immediate threat to the officers or others; and (3) whether Smith was fleeing or actively resisting arrest. *Graham*, 490 U.S. at 396. The Court is not limited to these factors in its analysis. *Id.*

The nature and severity of the crime here was extremely serious. Smith was a passenger in a car whose occupants were suspected of shooting a gun at the Home Club and had fled the scene of the shooting. Moreover, shots had just been fired at the scene of the traffic stop; from "the perspective of a reasonable officer on the scene," it was impossible to know whether those shots had been fired by the officers on the scene or the car's passengers. *See Jones*, 465 F.3d at 61 (quoting *Graham*, 490 U.S. at 396). *Riordan v. Joyner*, No. 02-cv-1132, 2005 WL 752210, at *6, 2005 U.S. Dist. LEXIS 5312, at *16 (D. Conn. Mar. 31, 2005) (weighing *Graham* factors and finding the severity of crime justified use of force where the defendants "reasonably suspected [the plaintiff] of possessing and discharging a firearm").

With respect to whether Smith posed an immediate threat, the Court notes that on Plaintiffs' version of events, Smith exited the Nissan with his "hands up" and told the officers, "I don't have anything in my hands. Don't shoot me." (Dkt. No. 99-1, at 81). According to Plaintiffs, Smith never took any threatening action while running away from the officers. The Court is, however, mindful that Defendants had reason to believe Smith might be armed. In addition, the undisputed evidence establishes that Smith was fleeing: according to his own testimony he continued to flee even after officers commanded Smith to "freeze" and "get down." (*Id.*). Smith kept fleeing even after Jordan tackled but then lost his grip on Smith. (*Id.* at 91).

Smith has, however, raised a triable issue of fact as to the reasonableness of the degree of force Filli used. To be sure, under the circumstances, Filli was entitled to use *some* degree of force to prevent Smith from fleeing. *Sullivan*, 225 F.3d at 165–66 ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit."). The force used here allegedly caused Smith permanent vision loss in his right eye. (Dkt.

No. 99-1, at 102). Viewing the evidence in the light most favorable to Smith, triable issues of fact, remain as to whether the degree of force used by Filli was excessive. *See Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (reversing grant of judgment as a matter of law where there were "factual issues as to the degree of force actually employed and its reasonableness"); *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("The issue of excessive force also was for the jury, whose unique task it was to determine the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct."); *Hicks v. Craw*, 405 F. Supp. 3d 374, 386–87 (N.D.N.Y. 2019) ("Of course, the issue in this case is not whether Defendants could use some force to arrest Plaintiff after he fled them, but whether the force they used was unreasonable under the circumstances."); *Betancourt v. Slavin*, 676 F. Supp. 2d 71, 78 (D. Conn. 2009) (denying defendants summary judgment on their excessive force claim and explaining that there were "disputed issues of material fact" as to, inter alia, whether "the degree of force used" was excessive). Accordingly, the Court denies summary judgment to the State Defendants on this claim.

### 2. Force Used While Handcuffing Smith

Filli, Jordan, and Esposito seek summary judgment for the alleged force used against Smith while Filli and Jordan "secure[d] Smith's hands and place[d] him in handcuffs." (Dkt. No. 99-6, at 15). Plaintiffs responds that Defendants "rely upon disputed issues of fact as to the force they utilized." (Dkt. No. 105, at 13–14).

Here, the Court finds there are material disputes that prevent the grant of summary judgment as to the alleged force used while Smith was being handcuffed. Weighing the *Graham* factors and viewing the evidence in the light most favorable to Smith, there are material issues of fact as to whether Smith was resisting arrest and whether he was still a threat or potential threat when the officers were handcuffing him. According to Smith, he had been knocked out cold by

Filli's punch to his face. (Dkt. No. 99-1, at 94–95). When Smith came to, he testified that his face was being "mushed into the snow" and estimated being struck as many as 22 times. (*Id.* at 101, 103–04, 107). It "may be objectively unreasonable" to use force "against a suspect when he has been stopped and no longer poses a risk of flight." *Soto v. Gaudett*, 862 F.3d 148, 153, 159 (2d Cir. 2017) (finding the use of force unreasonable where the plaintiff was "flat on his face" and tased while he "posed no physical threat to the officers"); *Tracy*, 623 F.3d at 95–96 (holding that the officer's use of force was unreasonable where he used pepper spray after plaintiff was already subdued and "was offering no physical resistance"). Accordingly, summary judgment is denied to Filli, Jordan, and Esposito as to alleged force used while handcuffing Smith.

### 3. Force Used Against Smith After He Was Handcuffed

Filli, Jordan, and Esposito seek summary judgment for the alleged force used against Smith after he was handcuffed. (Dkt. No. 99-6, at 17–18; Dkt. No. 101-9, at 11–12). Filli and Jordan make two primary arguments in support of summary judgment. First, they argue summary judgment is proper because, according to them, Smith "is unable to distinguish between any of the officers from the different law enforcement agencies." (Dkt. No. 99-6, at 21). Second, they argue that "despite this allegedly vicious assault involving over thirty strikes, Plaintiff suffered only minor bruising that healed shortly after the incident." (*Id.*). Esposito argues that his use of force in "securing plaintiff's legs to aid in handcuffing was not unreasonable." (Dkt. No. 101-9, at 12–13). Plaintiffs respond that, at the stage, the Court should credit Smith's testimony that "he was both punched and kicked following his handcuffing," (Dkt. No. 105, at 14–15), and that "officers who admit to making physical contact" with Smith "following his flight from the vehicle, may be held liable for both excessive force or failure to intervene." (*Id.* at 15).

### a. The Extent of Smith's Injuries

Jordan and Filli argue that Smith's excessive force claim fails as a matter of law because he suffered "only minor bruising that healed shortly after the incident in as little as two days" and that "[p]hotographs of Smith taken the same day of the incident . . . belie Smith's allegations of a vicious and prolonged assault." (Dkt. No. 99-6, at 21). Plaintiffs argue that "it is well settled that the plaintiff need not demonstrate any particular level of injury to allege an excessive force claim." (*Id*.).

The Second Circuit and district courts in the Circuit recognize that when the "injury resulting from alleged excessive force" is *de minimis*, "the excessive force claim is dismissed." *Jackson v. City of New York*, 939 F. Supp. 2d 235, 253 (E.D.N.Y. 2013) (quoting *Lemmo v. McKoy*, No. 08-cv-4264, 2011 WL 843974, at *5, 2011 U.S. Dist. LEXIS 23075, at *14 (E.D.N.Y. Mar. 8, 2011)); *United States v. Walsh*, 194 F.3d 37, 47–48 (2d Cir. 1999) (explaining in the pre-trial detainee context that "a claim of excessive force may be established even if the victim does not suffer serious or significant injury, provided that the amount of force used is more than *de minimis*") (internal citation and quotation marks omitted); *see also Feliciano v. Thomann*, 747 F. App'x 885, 887 (2d Cir. 2019) (citing *Walsh* in the Fourth Amendment excessive force context)). "Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches from a cut inside the mouth." *Jackson*, 939 F. Supp. 2d at 253 (quoting *Lemmo*, 2011 WL 843974, at *5, 2011 U.S. Dist. LEXIS 23075, at *15).

Here, viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiff Smith has adduced enough evidence to show that he suffered more than *de minimis* injury. Plaintiff Smith testified that he was "punched [and] kicked" and that there "[c]ould have

been a couple of knees" to the right side of his face, and that he "can't see out of [his] right eye at all" and that his vision is "superly [sic] impaired" following the incident. (Dkt. No. 99-1, at 102). *See Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004), *supplemented*, 108 F. App'x 10 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising." (citing *Robison v. Via*, 821 F.2d 913, 924–25 (2d Cir. 1987))). Moreover, Plaintiff Smith testified that following the incident he was diagnosed with "Posttraumatic stress disorder" ("PTSD") and "[a]nxiety." (Dkt. 99-1, at 127). *See Martinez v. Thompson*, No. 04-cv-0440, 2008 WL 5157395, at *8, 2008 U.S. Dist. LEXIS 98961, at *23–24 (N.D.N.Y. Dec. 8, 2008) (upholding a jury verdict in excessive force case where plaintiff suffered from PTSD including nightmares, fear of law enforcement officials, anxiety, depression, but also had physical injuries including a broken rib and chronic headaches); *see also Jennings v. Decker*, 359 F. Supp. 3d 196, 207 (N.D.N.Y. 2019) ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." (quoting *Robison*, 821 F.2d at 924)). Accordingly, the Court finds Plaintiff Smith has advanced sufficient evidence of injury to defeat summary judgment on his excessive force claims.

### b. Smith's Inability to Identify the State Defendants

Jordan and Filli also argue that Smith "is unable to present any evidence . . . to demonstrate that the State Defendants participated in this alleged assault" because Plaintiff Smith "is unable to distinguish between any of the officers from the different law enforcement agencies." (Dkt. No. 99-6, at 21). Plaintiffs responds that they do not have a "duty at the summary judgment stage to distinguish which officers used excessive force and which failed to intervene." (Dkt. No. 105, at 13).

It "is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Plaintiffs, however, "need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Ricks v. O'Hanlon*, No. 07-cv-9849, 2010 WL 245550, at *5, 2010 U.S. Dist. LEXIS 4189, at *13 (S.D.N.Y. Jan. 19, 2010) ((quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) (citation omitted)). They need only produce evidence that Defendants "were present on the night in question and participated in [Smith's] arrest." *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017); *Ricks*, 2010 WL 245550, at *4–5, 2010 U.S. Dist. LEXIS 4189, at *9–13 (denying defendant officer's motion for summary judgment where there was evidence defendant was present and participated in the apprehension of plaintiff).

Here, Smith identified Jordan, Filli, and Esposito, (Dkt. No. 99-1, at 151–52), as the officers around him "participat[ing] in his arrest." *John*, 406 F. Supp. 3d at 245. The Court therefore rejects this argument. Accordingly, the Court finds that there are material issues of fact as to whether Defendants used excessive force against Smith after he was secured in handcuffs. (*Id.* at 101, 103–04, 107).

####    4.    Filli, Jordan, and Esposito's Entitlement to Qualified Immunity for the Alleged Uses of Force Against Smith

Filli, Jordan, and Esposito move, in the alternative, for summary judgment on the basis of qualified immunity for: (1) Filli's initial force used against Smith ; (2) the alleged force used against Smith before the officers handcuffed him; and (3) the alleged force used against Smith after the officers handcuffed him. (Dkt No. 99-6, at 22–23, Dkt. No. 101-9, at 19–20). Plaintiffs counter that it is "axiomatic that qualified immunity cannot be decided in light of material factual

disputes such as the ones which exist in this matter." (Dkt. No. 105, at 12). The Court agrees—because factual issues remain that bear on the qualified immunity analysis, qualified immunity is precluded at this stage. *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman*, 374 F.3d at 109)); *see also Thomas*, 165 F.3d at 143 ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."). The Court finds that there are such factual disputes here. Accordingly, Esposito, Jordan, and Filli are denied qualified immunity at this stage of the proceedings.

### E.    Failure to Intervene as to Smith

Because there are material issues of fact as to whether Filli, Jordan or Esposito used excessive force against Smith, the Court must consider the Defendants argument that they did not have "a realistic opportunity to intervene to prevent the harm from occurring." *Felix*, 2019 WL 4747958, at *6, 2019 U.S. Dist. LEXIS 168670, at *18 (quoting *Branen*, 17 F.3d at 557). Esposito argues that "Plaintiffs fail to show that [Esposito] . . . had a realistic opportunity to intervene and prevent the alleged harm; that a reasonable person in the officer's position would know that the victim's constitutional rights were allegedly being violated; and that the officer did not take reasonable steps to intervene." (Dkt. No. 101-9, at 14). Further, Esposito argues that "[m]ere inattention or inadvertence does not rise to the level of deliberate indifference sufficient to support liability for failure to intervene." (*Id.*). Plaintiffs respond that Filli, Jordan, and Esposito—each of whom "admit to making physical contact" with Plaintiff Smith "following his flight from the vehicle"—may be held liable for "both excessive force or failure to intervene." (Dkt. No. 105, at 15).

"Whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa*, 825 F.3d at 107. The "assault's duration will always be relevant and will frequently assume great importance." *Id.* Here, at this juncture, the Court finds that there are material disputes of fact that preclude summary judgment on Plaintiffs' failure to intervene claim.

Here, Smith estimated being struck over thirty times from the time he regained consciousness until he was placed into the ambulance. (Dkt. No. 99-1, at 105), including as many as 21 times after he was handcuffed. (*Id.* at 103–04, 107). Smith also testified that after he handcuffed the officers continued to strike him for as long as "approximately a minute . . . and a half." (Dkt. No. 99-1, at 109). The question of whether the officers had time to intervene will be for the jury. *See Figueroa*, 825 F.3d at 108 ("[W]e conclude that [the plaintiff's] failure-to-intervene claims—even assuming that the assault lasted less than twenty seconds—were for the jury to decide."). Thus, the Court finds that there are triable issues of fact as to whether Filli, Jordan, and/or Esposito—had an opportunity to intervene to prevent the other officers from using excessive force against Smith. Accordingly, summary judgment is denied as to Smith's failure to intervene claim.

V.      **CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendant Riley's Motion for Summary Judgment (Dkt. No. 100) is **GRANTED** in its entirety; and it is further

**ORDERED** that Defendant Riley is **DISMISSED** from the case; and it is further

**ORDERED** that the State Defendants' Motion for Summary Judgment (Dkt. No. 99) is **DENIED**; and it is further

**ORDERED** that the Town of Lloyd Defendants' Motion for Summary Judgment (Dkt. No. 101) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Plaintiff Gordon's failure to intervene claim against Defendant Sawyer (part of Claim 3) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Town of Lloyd Defendants' Motion for Summary Judgment (Dkt. No. 101) is otherwise **DENIED**; and it is further

**ORDERED** that the following claims may proceed to trial: Plaintiff Gordon's excessive force claim against Defendant Sawyer (Claim 1); and Plaintiff Smith's excessive force and failure to intervene claims (Claim 2 and part of claim 3) against Defendants Filli, Esposito, and Jordan.

**IT IS SO ORDERED.**

Dated: January 27, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge